# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **Ronnie G. Johnson**, )  | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:11-cv-3857-KOB |
| ) | |
| **MICHAEL J. ASTRUE**, ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On April 17, 2008, the claimant, Ronnie G. Johnson, applied for disability insurance benefits and supplemental security income under Titles II and Title XVI of the Social Security Act. (R. 16). The claimant alleges disability commencing on March 25, 2008, because of a heart attack, back pain, and knee pain. (R. 70). The Commissioner denied the claims. (R. 31). The claimant filed a timely request for a hearing before an Administrative Law Judge (R. 37), and the ALJ held a hearing on November 3, 2009. (R. 222). In a decision dated January 23, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and thus was ineligible for disability insurance or supplemental security income. (R. 16). On September 9, 2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 4). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

1

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ failed to fully develop the record by not obtaining a Medical Source Opinion before making findings regarding the claimant's Residual Functional Capacity; and (2) whether the ALJ failed to properly consider the effects of the claimant's obesity, particularly regarding the claimant's respiratory function.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986). "[The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

2

has lasted or can be expected to last for a continuous period of not less than 12 months...." To make this determination the Commissioner employs a five-step, sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

At each one of these steps, "[t]he Comissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for [disability insurance benefits or supplemental security income]." 42 U.S.C. § 405(b)(1). This means that "at the administrative law judge hearing level … the administrative law judge … is responsible for assessing [a claimant's] residual functional capacity." 20 C.F.R. § 404.1546(c). In making these findings, an ALJ "may ask for and consider the opinion of a medical or psychological expert concerning whether [a claimant's] impairment(s) could reasonably be expected to produce the alleged symptoms," but such an opinion does not involve a determination of intensity, persistence, or functional limitations. 20 C.F.R. § 404.1529(b).

Additionally, "the ALJ has a basic obligation to develop a full and fair record," but developing a full and fair record "may not require the use of expert-testimony." *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988). "[T]he failure to include [an RFC assessment from a medical

3

source] at the State agency level does not render the ALJ's RFC assessment invalid," *Langley v. Astrue*, 777 F. Supp. 2d 1250, 1261 (N.D. Ala. 2011), nor does the ALJ's duty to develop the record change the fact that "the claimant bears the burden of proving that he is disabled" and must provide evidence to that end, *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

SSR 02-1p indicates that "obesity can cause limitations in all exertional and postural functions," "can affect an individual's ability to sustain routine movement and work activity," and "may increase the severity of coexisting or related impairments." As such, SSR 02-1p requires the Commissioner to weigh the effect of "the *impact* of obesity on an individual's functioning when deciding whether an impairment is severe." SSR 02-1p (emphasis added).

## V. FACTS

The claimant has a tenth grade education without a GED and was forty-five years old at the time of the administrative hearing. (R. 224). His past work experience includes employment as a factory shift leader, a construction equipment operator, and a courier. (R. 77). The claimant alleges disability because of pain, numbness, and shortness of breath severe enough that he cannot perform work at any exertional level. (R. 112). The claimant alleges that these symptoms became disabling on March 25, 2008, as a result of a heart attack coupled with pre-existing back and knee problems. (R. 70-71).

*Physical Limitations*

On the evening of March 25, 2008, the claimant suffered a heart attack, and Dr. Lawrence Kulish admitted him to the emergency room of Chestatee Regional Hospital in Dahlonega, Georgia. (R. 114). Dr. Kulish diagnosed the claimant with Coronary Artery Disease (CAD) and Chronic Obstructive Pulmonary Disease (COPD), and then transferred him to the

care of cardiologist Dr. Abhishek Gaur at Northeast Georgia Medical Center in Gainesville, Georgia for heart surgery. (R. 122).

Upon arrival, Dr. Gaur examined the claimant and noted that the claimant had no previous history of cardiac problems; had a history of hypertension and surgery to his left knee; had smoked two packs of cigarettes per day for 34 years; was morbidly obese; and occasionally complained of lower back pain. (R. 135-36). The claimant underwent a left heart catheterization, and on March 27, 2008, the operating physician, Dr. Christopher Leach, unsuccessfully attempted a coronary intervention to unblock the claimant's occluded mid-right coronary artery. Afterwards, Dr. Leach transferred the claimant to ICU for monitoring. Dr. Mark Wolozin subsequently examined the claimant on March 29, 2008 and deemed the claimant medically stable for discharge. Dr. Gaur advised the claimant of his need for a lifestyle change to address his obesity and tobacco addiction and placed him on Aspirin, lisinopril, Zocor, Imdur, Lopressor, nitroglycerin or Nitrostat, and Norvasc with orders for a follow up appointment. (R. 124-26).

At Dr. Gaur's referral, the claimant visited Dr. Kashyap Patel on April 10, 2008. Dr. Kashyap Patel examined the claimant and found his condition stable; the claimant was "in no acute distress " and was "alert and oriented." Dr. Patel noted, however, that the claimant was generally "very drained, weak, and run down." Dr. Patel adjusted the claimant's medication to better address hypotension, again advised him to quit smoking, and ordered a return visit in three months. The claimant did not return. (R. 139-41).

Pursuant to the claimant's application for disability, the state disability specialist, Martha Crittenden, required the claimant to complete a work history report on July 14, 2008. The claimant reported that he had worked at Friskies Pet Food in the shipping and receiving

5

department from August 1984 until June 2002; at Clark Crane as a laborer and crane operator from June 2002 until August 2003; and at Pick Up 'N Go Carrier (later Peachtree Delivery) as a courier from March 2004 until April 2008. At Friskies Pet Food, the claimant reported that he worked full-time as a supervisor; frequently lifted fifty-pound bags of dog food; and used machinery such as forklifts. At Clark Crane, the claimant reported that he moved cranes and crane parts; cables; rigging equipment; and frequently lifted loads of 100-pounds or more. At Pick Up 'N Go Carrier, the claimant reported that he picked up small objects or packages of usually less than ten pounds; placed them in his automobile; delivered these packages to offices; and that his job involved sitting standing and walking, but no climbing, kneeling, crouching, crawling, or handling or grasping of large objects. (R. 96-100).

      Additionally pursuant to the claimant's social security disability application, examining physician Dr. Marlin Gill examined the claimant on August 8, 2008, and found that the claimant's CAD was under control, though the claimant would occasionally, but not consistently, feel chest pain with exertion. The claimant continued to smoke and had labored breathing with exertion, but had no trouble breathing at rest and was on no medications for his breathing. The claimant had some discomfort with lumbar movement, and x-rays revealed mild to moderate multilevel degenerative disc disease in his lumbar spine. Additionally, the claimant had severe degenerative disc disease at L5-S1 of his spine. Dr. Gill found that the claimant could do light housecleaning; cut a very small yard with a push mower, with periods of rest; drive; shop for groceries; take care of his own personal needs and hygiene; sit for up to thirty minutes; stand for up to fifteen minutes; and walk a half-mile without any assistance. The claimant's gait was normal; he could move his arms and legs without limitation; he could bend ninety degrees at

the waist and return to an erect position; his legs were normal and had good muscle tone; and he could squat half-way and return to a standing position while holding onto a table for balance. (R. 142-44).

Consulting physician Dr. Robert Estock also examined the claimant on August 13, 2008 for psychiatric disabilities. Dr. Estock determined that the claimant had no serious psychiatric impairments, though he noted the claimant's history of depression and anxiety. (R. 154, 166).

After these examinations, the state disability specialist, Martha Crittenden, examined the claimant's file on August 13, 2008. Ms. Crittenden determined that the claimant had an RFC for light work and could occasionally lift up to 20 lbs.; frequently lift up to 10 lbs.; stand or walk with normal breaks about 6 hours in an 8-hour workday; sit with normal breaks for about 6 hours in an 8-hour workday; had no limitations on pushing and/or pulling activities; should not climb ladders or scaffolds; and had no limitations on visual or manipulative activity. Ms. Crittenden also determined that the claimant had no issues with communication, and no environmental limitations. (R. 147-51). With a restricted RFC for light work, Ms. Crittenden found that the claimant could perform other jobs that existed in substantial numbers within the national economy, such as wafer-line worker, fabric-layout worker, and rag inspector. (R. 57-59). Ms. Crittenden's concluded that the claimant had medically determinable impairments such that "it is reasonable to assume that claimant can not do [the tasks mentioned above] without some slight problems," and that the claimant's allegations were "partially credible for severity," but not disabling. (R. 151). These findings, in turn, provided the basis for the Regional Commissioner's decision on August 14, 2008 that the claimant was not disabled. (R. 212).

Between the time of the Regional Commissioner's August 14, 2008 decision and the claimant's hearing before the ALJ on November 3, 2009, the claimant visited hospitals on three occasions. (R. 231). He first visited the emergency room of Athens-Limestone Hospital on May 25, 2009 for back pain and numbness in his extremities. (R. 199). Attending physician, Dr. Wayne Jones, prescribed several pain relieving medications for the claimant, and ordered the claimant to follow up with Dr. Luckett later that week. (R. 203-04). The claimant did not return.

The claimant also visited Central North Alabama Health Services, Inc. on August 31, 2009 for back pain and numbness in his extremities that he stated had grown worse. At the time of examination, however, the claimant rated his pain at "0" on a scale of 0-10, with 10 being the greatest amount of pain. The claimant's attending physician, Dr. M. Padgett, stated in an assessment note that the claimant "needs medical resources ASAP," but records from this visit give no further explanation. (R. 169).

Finally on October 25, 2009, the claimant visited Decatur General Hospital for chest discomfort described as "a pressure tightness" that "subsided spontaneously." At the time of attending physician Dr. Akinsoto's examination, the claimant rated his pain as "2" on a scale of 0-10. Dr. Akinsoto referred the claimant to consulting physician Dr. Villanueva to determine whether the claimant's CAD or COPD was the primary cause of the claimant's chest pain. On the evening of October 25, Dr. Villanueva ran a stress test. The stress test came back negative, and Dr. Villanueva subsequently released the claimant with strong advice to lose at least an additional forty pounds and cease smoking entirely.[1] (R. 176-78, 183).

---

[1] At that time, the claimant had cut his smoking in half and lost thirty pounds since the time of his heart attack. (R. 177). Dr. Villanueva advised further lifestyle modification.

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance and supplemental security income, the claimant requested and received a hearing before an ALJ on November 3, 2009. (R. 37). At the hearing, the claimant testified that he had worked several jobs, the last being as a courier for Peachtree Delivery in Atlanta, Georgia. He worked at Peachtree Delivery until his heart attack on March 25, 2008, after which he filed for disability. He testified that he was divorced and had one grown daughter. At the time of the hearing, the claimant said that he weighed 274 pounds, after previously weighing over 320 pounds, and testified that the weight loss had helped his blood pressure. The claimant stated that he took medication for his blood pressure, his heart, high cholesterol, and his knees. Discussing his heart attack, the claimant testified that Dr. Leach had unsuccessfully attempted to conduct angioplasty surgery. The surgery was unsuccessful because Dr. Leach accidentally broke another artery in his attempt to repair the claimant's right coronary artery. The claimant testified that, at Dr. Gaur's and Dr. Villanueva's urging, he had significantly cut back on smoking (less than one-half of a pack per day, down from two packs per day), and had lost fifty pounds since reaching his heaviest point. He stated that he did not have a regular doctor in Dahlonega, Georgia, and had not established a regular doctor since moving to Athens, Alabama. The claimant testified that he had visited the emergency room three times in the past year: once recently for his chest; once for his back; and once for his shoulder and arm.[2] (R. 225-32, 236).

---

[2] The claimant also testified that two of these visits were to Athens-Limestone Hospital. The claimant's medical records, however, only reflect one visit to Athens-Limestone.

When questioned specifically on his inability to work, the claimant testified that he could "sit for a while and after 20 maybe 30 minutes it's really hard to sit and stay still because of the pain. And it's in my lower back and actually kind of below my – I think my tailbone. And to stand and walk it really – it's really stressful on my back." When asked if his back pain was the main reason he could not work, he testified that it was, while mentioning his breathing as a secondary issue. Specifically regarding his back, the claimant testified that he had seen a doctor about his back ten years previously, who had told him that he was not a candidate for surgery. The claimant stated that he had not seen a surgeon about his back as he had not had insurance for several years. Upon further questioning, the claimant stated that he had stopped working because of his heart condition, but that his back kept him from work. (R. 232-35). Had the heart attack not occurred, the claimant testified that he would probably still work as a courier. The claimant testified that his back condition had existed for over twenty years prior to his heart attack. (R. 239-40).

The claimant additionally testified that he lived in a mobile home near his mother; handled his own personal needs; had a driver's license and owned a truck that he would use for grocery shopping; drew $120 per month in food stamps; and received occasional financial aid from friends and family. (R. 233-34). The claimant stated that, other than the occasional outing for pizza, he generally stayed home and watched TV or played games with his mother, who was in good health. The claimant also said that he had sustained several work injuries prior to his heart attack in 2008, including being run over by a forklift operator in the early 2000s; falling through a flatbed trailer about 2004; and falling off a crane in 2005. The claimant's 2005 accident required knee surgery. His back pain, however, had started before any of these injuries.

10

(R. 238-39). The claimant stated that, since losing his job as a courier, he had applied to work several other jobs, including work as a forklift driver. The claimant, however, expressed some concerns about his ability to perform that work on a fulltime basis, (R. 241), but stated that he could perform this work on at least a part-time basis, (R. 246).

*The ALJ's Decision*

On January 23, 2010, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 13). Using the five-step sequential evaluation process established by the Social Security Administration, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability, despite working as a courier for two weeks after his heart attack on March 25, 2008. Next, the ALJ found that the claimant had severe impairments, including CAD, hyperlipidemia, hypertension, degenerative disc disease of the lumbar spine, osteoarthritis of the knees bilaterally, history of status post internal fixation of the left knee, COPD, tobacco addiction, and obesity. The ALJ found that these impairments cause "more than minimal limitations on the claimant's ability to engage in work-related activities," but concluded that the impairments did not singly nor in combination manifest the specific signs and diagnostic findings required for disability under the Listing of Impairments. (R. 18-19).

In determining the claimant's residual functional capacity, the ALJ determined that the claimant could perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he should never climb ladders, ropes or scaffolds and he should avoid exposure to unprotected heights." To reach this conclusion, the ALJ found that the claimant had medically determinable impairments that could reasonably be expected to cause the alleged symptoms (e.g. pain,

numbness, and shortness of breath), but that these symptoms were not as severe as the claimant alleged. (R. 19-20).

In dismissing the claimant's allegations of total disability, the ALJ pointed to the claimant's lack of ongoing medical care; apparent lack of need for ongoing medical care; and the inconsistencies between the claimant's allegations of disabling pain and his medical records showing occasional or sporadic pain. The ALJ noted the claimant's own testimony that he can perform daily activities such as walk one-half mile in fifteen minutes; push mow his grass; drive; shop for groceries; feed his cats and dogs; handle his own bank accounts; and see to his personal needs. The ALJ found that Dr. Gill's report that the claimant could perform a wide range of daily activities and that the claimant's pain "comes and goes" corroborated the claimant's own testimony about his daily functionality, which was inconsistent with total disability. Further, the ALJ noted that the claimant's own description of his symptoms as "sporadic" and "occasional" was consistent with the claimant's infrequent use of medical services and inconsistent with allegations of total disability. Finally, the ALJ determined the claimant's COPD had not resulted in any greater restrictions than those already determined. The ALJ based this determination on the claimant's lack of consistent complaints about his breathing; Dr. Gill's assessment that the claimant's lungs were clear and his respiration normal; and the claimant's continued habit of smoking against Dr. Gaur's and Dr. Villanueva's express advice. (R. 20-23).

When discounting the claimant's testimony, ALJ noted that the claimant's credibility is suspect and that his testimony is inconsistent. First, the ALJ pointed out that the claimant's work history is inconsistent. Specifically, the ALJ noted that the claimant's testimony that he earned $750 per week as a courier from 2004-2007 but did not file this income for tax purposes drew

the claimant's credibility into question. Second, the ALJ noted that the claimant alleged total disability beginning on March 25, 2008, but that he returned to work in April of 2008 for two weeks and filed applications for several jobs after that time, including one as a forklift driver. The ALJ considered the claimant's return to his previous job and his additional applications as evidence that the claimant's pain was not completely disabling, and that the claimant had on at least a few occasions not considered himself incapable of work. (R. 23).

Finally, in making his RFC determination, the ALJ noted that although Martha Crittenden, the state agency disability specialist who originally reviewed the claimant's file, was not an acceptable medical source, he found her assessment to be "most consistent with the medical evidence as a whole, and [adopted] it in assessing the claimant's impairments." The ALJ then relied on Crittenden's assessment in finding that the claimant had an RFC for light work with minimal exceptions. (R. 24)

After determining the claimant's RFC, the ALJ then considered whether the claimant could perform his past work, and determined that the claimant could still work as a courier, though not in the warehouse settings as he had previously. To support this determination, the ALJ referenced the claimant's description of this job as "picking up and delivering small objects or packages from offices to his automobile and … sitting, standing, and walking, but no climbing, kneeling, crouching, crawling, or handling or grasping of large objects." (R. 99-100). The ALJ found that this description of the claimant's courier job was consistent with the claimant's RFC for light work and the claimant's return to work in April of 2008 before Peachtree Delivery released him due to liability concerns. (R. 24).

Finally, the ALJ took the extra step of determining that, in addition to being able to work as a courier, the claimant could also work several other jobs that existed in significant numbers in the national economy. Specifically, the ALJ found that as a younger individual with a tenth grade education and a restricted RFC for light work, the claimant was "not disabled" under Medical-Vocational Rule 202.18 for the occupational base of unskilled light work. Under Social Security Ruling (SSR) 83-14, the claimant's RFC restrictions did not change this conclusion, and the ALJ found that at the initial determination level, the disability specialist, Martha Crittenden, determined that the claimant's RFC allowed him to work jobs such as a wafer-line worker, fabric layout worker, and rag inspector. The ALJ confirmed that these jobs fall within the claimant's RFC for light work. (R. 25).

Given these findings, the ALJ determined that the claimant was not disabled under section 1614(a)(3)(A) of the Social Security Act from March 25, 2008 to January 23, 2010, and, thus, not eligible for either disability insurance or supplemental security income.

## VI. DISCUSSION

The claimant argues that the ALJ failed to properly develop the record when he did not obtain a Medical Source Opinion and that the ALJ failed to properly consider the claimant's obesity, specifically in relation to the claimant's respiratory function. For the reasons stated below, this court finds that the ALJ properly developed the record and properly evaluated the claimant's obesity.

**I. The ALJ Properly Developed the Record Without Obtaining a Medical Source Opinion.**

The claimant argues that "the ALJ is required to review and accord weight to medical opinion, and as a practical matter, to avoid substituting his or her judgment for that of a

14

physician." As such, the claimant argues that the ALJ *must* obtain a MSO to avoid substituting his own judgment for that of a physician, and that the ALJ's failure to do so in this case was reversible error. (Cl. Memo. at 6-7).

The logic of this claim does not hold water, however. The ALJ is designated by the SSA to make decisions regarding a claimant's disability for social security purposes, and since determining a claimant's RFC is nearly dispositive in that decision, the determination of a claimant's RFC is left to the ALJ. Title 42 U.S.C. § 405(b)(1) states that "[t]he Comissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for [disability insurance benefits or supplemental security income]," and that means that "at the administrative law judge hearing level … the administrative law judge … is responsible for assessing your residual functional capacity," 20 C.F.R. § 404.1546(c). Furthermore, "the failure to include [an RFC assessment from a medical source] … does not render the ALJ's RFC assessment invalid." *Langley v. Astrue*, 777 F. Supp. 2d 1250, 1261 (N.D. Ala. 2011).

This court acknowledges that "the ALJ has a basic obligation to develop a full and fair record." *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988). Developing a full and fair record, however, "may not require the use of expert-testimony." *Id.* The ALJ "may ask for and consider the opinion of a medical expert," (20 CFR 404.1529(b)(*emphasis added*)), but "may" does not equal "must." The ALJ's duty to develop the record does not extend indefinitely; and as demonstrated above, the ultimate determination of a claimant's RFC or a claimant's disability belongs solely to the ALJ. Indeed, the Eleventh Circuit has recognized that because the determination of disability was a decision reserved to the ALJ alone, "the ALJ is free to reject

the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

In light of these principles, to rigidly require that an ALJ obtain a MSO seems illogical under circumstances where the record is already sufficiently developed to make a determination of disability. To maintain otherwise would suggest that an ALJ has an inability to make a RFC or disability finding without at least one doctor's formal MSO, *even if* the ALJ ultimately disregarded that MSO or had enough additional evidence to form his own opinion. In this case, the ALJ had substantial evidence in the record to make specific findings regarding Claimant's disability. Had the Claimant wished to present a MSO for the ALJ's consideration, he was welcome to do so, but the ALJ's responsibility to develop the record does not absolve the claimant of his duty to prove his own disability. (*See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)). This court finds that the record in this case was sufficiently developed such that the ALJ did not need to obtain a MSO and that substantial evidence supports the ALJ's decision.

**II. The ALJ Properly Considered the Effects of the Claimant's Obesity, Particularly Related to the Claimant's Respiratory Function.**

Next, the claimant argues that the ALJ failed to properly consider the effects of his obesity. For support, the claimant says that the ALJ's findings "somewhat minimalize the evidence of the record" concerning his obesity. Specifically, the claimant argues that the ALJ acknowledged that the claimant had a medically determinable impairment of obesity, but the record reflects that Dr. Gaur diagnosed the claimant with *morbid* obesity in March 2008. (Cl. Memo at 5). Additionally, the claimant notes that, under SSR 02-1p "obesity can cause limitations in all exertional and postural functions" and "can affect an individual's ability to

sustain routine movement and work activity." Obesity can also affect respiratory function, which the claimant alleges that the ALJ failed to consider by dismissing the claimant's pulmonary irritants. *Id.* at 8-9.

      The claimant's description of obesity under SSR 02-1p is accurate, but his characterization of the ALJ's reasoning is not. The claimant's argument that the ALJ "somewhat minimalized" his obesity falls flat under SSR 02-1p, which notes that descriptive words "describe the extent of obesity, but they do not correlate with any specific degree of functional loss." SSR 02-1p(2). More specifically, SSR 02-1p notes that obesity is severe when "it significantly limits an individual's physical or mental ability to do basic work activities," but that "descriptive terms for levels of obesity (e.g. "severe," "extreme," or "morbid" obesity) [do not] establish whether obesity is or is not a severe impairment for disability program purposes." SSR 02-1p(4). As such, the ALJ's finding that the claimant had a MDI of "obesity" rather than "morbid obesity" is irrelevant to later his considerations. Additionally, substantial evidence from the claimant's own testimony (R. 87-91) and from Dr. Gill's medical findings (R. 142) that show that the claimant was neither physically nor mentally unable to do basic work activities support the ALJ's implied finding that the claimant's obesity was not "severe" and that the claimant certainly was not disabled solely on account of his obesity.

      Still, while obesity alone did not classify the claimant as disabled, SSR 02-1p recognizes that "obesity may increase the severity of coexisting or related impairments" (SSR 02-1p(5)), such as respiratory function as implied in this case. The record reveals medical evidence of the claimant's labored breathing during times of exertion, but no breathing issues while at rest (R. 140, 142). These medical findings match the claimant's own testimony that he was partially

17

disabled due to his breathing, though he generally listed this issue as secondary to his back pain. (R. 232). The question, then, is not whether the ALJ appropriately considered obesity as much as whether the ALJ appropriately considered the claimant's respiratory difficulties, which obesity can exacerbate.

The ALJ specifically considered the claimant's respiratory history, symptoms, and complaints before reaching his conclusion. Relying on the claimant's own testimony and medical history, the ALJ found that the claimant's respiratory issues did not result in restrictions *greater than* those already determined. To any extent that the claimant's respiratory issues might result in greater restrictions, the ALJ discounted such restrictions on the basis of the claimant's tobacco use. Common sense may well support the ALJ's reasoning, but within the context of social security disability determination, discounting additional respiratory difficulties on account of tobacco usage is fairly novel. Hence, if the ALJ had substantially relied on this point to reach his decision, this court would need to carefully weigh the appropriateness of such reasoning.

The ALJ's decision *did not* substantially rely on this point, however, because the ALJ had previously found that the claimant's respiratory issues *did not* result in restrictions greater than those caused by other factors. Thus, this court finds that the ALJ's commentary on the claimant's continued tobacco usage was extraneous to his ultimate findings because no additional restrictions existed for tobacco usage to discount. The ALJ properly weighed all the relevant factors, including obesity, because he considered the cumulative effect of the medical and testimonial evidence concerning the claimant's respiratory function. The fact that the ALJ specifically discussed the claimant's tobacco dependence and did not specifically mention obesity during the course of this analysis does not affect the ALJ's ultimate finding in this case.

This court finds that the ALJ applied the correct legal standard under SSR 02-1p and substantial evidence supports the ALJ's findings concerning the claimant's respiratory function. (R. 22).

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.

This court will enter a separate order in accordance with this Memorandum Opinion.

DONE and ORDERED this 4th day of March, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE